**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAMELA CARTER-FROST, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) Civil Action No. 15-930 (EGS) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Pamela Carter-Frost ("Ms. Carter-Frost") brings three claims against Defendant District of Columbia ("District") for events arising from her employment with the District of Columbia Metropolitan Police Department ("MPD"). Her complaint alleges (1) gender discrimination; (2) retaliation; and (3) a hostile work environment—all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000(e), *et seq.*; the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq.*; and the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Section 1981"). Ms. Carter-Frost requests compensatory damages and expenses, in addition to other equitable relief, including ordering the District to institute policies against discrimination and imposing supervisory training. Pending before the Court is the District's motion for summary judgment. *See* Def.'s Mot., ECF No. 19. The Court has

carefully considered the motion, the response and reply thereto, the applicable law, and the entire record herein. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion for summary judgment. Ms. Carter-Frost's gender discrimination claim may proceed, but the District is entitled to summary judgment on her retaliation and hostile work environment claims.

## II. Background

Except where indicated, the following facts are not in dispute. Ms. Carter-Frost was an officer employed with the MPD for over twenty-five years before she retired in 2015. Pl.'s Dep., ECF No. 24-2 at 9:24-25; Retirement Order, ECF No. 24-4. She started her MPD career in 1990 as a patrol officer in the Sixth District. *Id.* at 9:24-25. However, for the vast majority of her employment, from 1992 to 2012, Ms. Carter-Frost worked as a time and attendance ("T&A") clerk within the Criminal Investigation Division ("CID"). Pl.'s Dep., ECF No. 24-2 at 11:6-20:3. As a T&A clerk, Ms. Carter-Frost was responsible for preparing the payroll by inputting time entries from the logbook, which documented each officer's shift. *Id.* at 16:3-17:1. She served as a T&A clerk in various MPD CID offices, but she last worked in CID Headquarters. *Id.* at 19:5-24. While Ms. Carter-Frost moved offices at least five times over those twenty

years, each detail as a T&A clerk was voluntary upon application or request. *Id.* at 11:6-20:3.

**A. Investigation and "Involuntary" Lateral Details**

In 2013, while serving as a T&A clerk at CID Headquarters, the Investigative Services Bureau ("Bureau") investigated Ms. Carter-Frost for misconduct. *See* Investigative Report, ECF No. 24-6. According to the Bureau's Report, Ms. Carter-Frost and another male officer referred to as "Officer J.Y.," were found to have violated MPD T&A policy from November 2012 through January 2013. *Id.* Officer J.Y. also performed administrative work at CID Headquarters. *Id.* at 2. Unlike Ms. Carter-Frost, Officer J.Y. was not a T&A clerk by title, but he had T&A login credentials, and he periodically entered T&A information. *Id.* at 3, 6. According to the Bureau's findings, Officer J.Y. allowed Ms. Carter-Frost to enter her own time using his unique T&A login code. *Id.* at 7. This violated MPD policy and exposed both officers to criminal liability because T&A clerks were not allowed to enter their own hours "due to conflict of interest." *Id.* at 6. While Ms. Carter-Frost admitted that she used Officer J.Y.'s code to enter her own time, she claims that she was unaware that doing so was prohibited by MPD rules. *Id.* at 3.

This finding was referred to the Office of the U.S. Attorney for the District of Columbia, which declined to prosecute the case, leaving the violation for administrative

resolution. USAO-DC Letter, ECF No. 24-10. At that point, the MPD upheld the charge against both officers and recommended "adverse action" ranging from reprimand to removal for both. Recommendation Letter, ECF No. 24-8; Notice of Proposed Action, ECF No. 24-9. Officer J.Y. was originally suspended for five days, Final Notice, ECF No. 24-5, but the suspension was rescinded on appeal. Appeal, ECF No. 24-11. Neither party submitted formal proof of Ms. Carter-Frost's punishment. *See generally* Def.'s Mot., ECF No. 19; Pl.'s Opp'n, ECF No. 24. However, it is undisputed that Ms. Carter-Frost was "involuntarily" transferred twice from her T&A work. Def.'s Reply, ECF No. 28 at 8, ¶ 22; 11, ¶ 32.

In November or December 2012, Ms. Carter-Frost was transferred to the Forensics Unit, where she "was assigned to sit in a workspace with no windows, no telephone, and no desk." Pl.'s Opp'n, ECF No. 24 at 5, ¶ 4. There, she was tasked with filing the police reports from every district. *Id.* ¶ 5. In February 2013, she was "involuntarily detailed" a second time to a patrol position in the Fifth District. *Id.* ¶¶ 6, 7. This post became permanent in May 2013, as "corrective action" for her T&A policy violation. Pl.'s Dep., ECF No. 24-2 at 52:24-53:19. Ms. Carter-Frost alleges that she felt threatened when faced with this corrective action: her choices, as she saw them, were to accept this transfer or be terminated. *Id.* at 58:14-59:13. As a

result of the transfer, Ms. Carter-Frost worked as a patrol officer for the first time in twenty-two years. *Id.* at 60:20-25. She remained on patrol until she retired in 2015.

## B. Denied Requests and Complaints

Ms. Carter-Frost alleges that she submitted several personnel requests, which were all denied. These requests included a request for leave in June 2011, *id.* at 38:8-40:7; a request to have her schedule changed at some point in 2012, *id.* at 46:4-47:11; and "two or three" requests to be transferred back to T&A work at the CID, *id.* at 30:10-18. Ms. Carter-Frost also alleges that, beginning in November 2012, she was denied the opportunity to accrue overtime or compensatory time. *Id.* at 40:20-41:2. According to Ms. Carter-Frost, her male colleagues had their "basic work requests granted," such as leave requests and work preferences. Pl.'s Opp'n, ECF No. 24 at 23-24.

Ms. Carter-Frost also alleges that she made several complaints regarding this perceived unfair treatment. She alleges that she first filed a complaint with MPD's Equal Employment Opportunity ("EEO") Branch in 2002, alleging a hostile work environment. Pl.'s Dep., ECF No. 24-2 at 26:25-27:19. According to Ms. Carter-Frost, she next complained in the spring of 2012 to a Commander about her supervisor's preferential treatment of male officers. *Id.* at 34:11-15. She allegedly made this complaint by sticking a post-it note on the

Commander's office door. *Id.* at 36:2-7. Next, Ms. Carter-Frost alleges that she filed a second EEO complaint on November 26, 2012, concerning the MPD's perceived "differential treatment, retaliation, and hostile work environment." Pl.'s Stmt. of Disputed Facts ("Pl.'s Stmt."), ECF No. 24-14 ¶ 19. However, according to a MPD Investigator who searched the MPD's EEO archives for 2002 and 2012, there is no record of either complaint. *See* Tapp Aff., ECF No. 19-2 ¶¶ 2-4.

Ultimately, on August 12, 2013, Ms. Carter-Frost filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Office of Human Rights (DCOHR) alleging retaliation, gender discrimination, and a hostile work environment. EEOC Charge, ECF No. 24-3 (amended). She received her right to sue notice on March 17, 2015, ECF No. 24-7, and timely filed this lawsuit on June 16, 2015.

### III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which

6

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). On the other hand, to defeat summary judgment, the nonmoving party must demonstrate that there is a genuine issue of material fact. *Id.* at 324. A material fact is one that is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a genuine dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, in the summary judgment analysis "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## IV. Analysis

### A. Ms. Carter-Frost's DCHRA Claims Are Not Time-Barred

As an initial matter, the District alleges that Ms. Carter-Frost's DCHRA claims for gender discrimination and retaliation are time-barred because: (1) the DCHRA statute of limitations is one year; (2) the last incident of discrimination/retaliation allegedly occurred in February 2013; and (3) Ms. Carter-Frost did not file her claim until June 16, 2015, over two years later. Def.'s Mot., ECF No. 19 at 7. The DCHRA requires that a "private cause of action . . . shall be filed . . . within one year of the unlawful discriminatory act, or the discovery

thereof." D.C. Code § 2-1403.16. But the statute of limitations
is tolled upon filing a complaint with the EEOC, which also
automatically cross-files a complaint with the DCOHR. *See, e.g.*,
*Craig v. District of Columbia*, 881 F. Supp. 2d 26, 33 (D.D.C.
2012); *Ibrahim v. Unisys Corp.*, 582 F. Supp. 2d 41, 45-47
(D.D.C. 2008) (citing *Esteños v. PAHO/WHO Federal Credit
Union*, 952 A.2d 878, 880-85 (D.C. 2008)). Ms. Carter-Frost filed
her amended EEOC claim, which was cross-filed with the DCOHR, on
August 12, 2013. EEOC Charge, ECF No. 24-3. On March 17, 2015,
the EEOC denied her claim and Ms. Carter-Frost received her
right-to-sue notice. Notice Right-to-Sue, ECF No. 24-7. She
filed this lawsuit on June 16, 2015. Therefore, the statute of
limitations was tolled from August 12, 2013—the date she filed
the EEOC complaint—through March 17, 2015—the date she received
the right-to-sue notice. Ms. Carter-Frost alleges
discrimination, retaliation, and a hostile work environment
through at least February 2013. *See generally* Compl., ECF No. 1.
Thus, excluding the time that was tolled while the EEOC
complaint was pending, only eight to nine months elapsed between
the date of last incident and the filing of the complaint. *See*
*Ibrahim*, 582 F. Supp. 2d at 45-46 (finding that the plaintiff's
DCHRA and Title VII claims were timely because the statute of
limitations was tolled while his claim was pending with the
EEOC). Because less than one year passed, Ms. Carter-Frost's

DCHRA claims are not time-barred by the applicable one year
statute of limitations.

### B. A Reasonable Jury Could Conclude That Ms. Carter-Frost Was Subject to Gender Discrimination

To establish a viable claim under Title VII, Section 1981,
and the DCHRA, Ms. Carter-Frost must provide sufficient evidence
to establish that she was subject to an adverse action motivated
by gender discrimination. Under Title VII, it is unlawful for an
employer to "discriminate against any individual with respect to
his . . . employment, because of such individual's race, color,
religion, sex, or national origin." 42 U.S.C. § 2000(e-2)(a)(1).
For her discrimination claims pursuant to all three statutes,[1]
Ms. Carter-Frost must establish "two essential elements": "(i)
the plaintiff suffered an adverse employment action (ii) because
of the plaintiff's race, color, religion, sex, national origin,
age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196
(D.C. Cir. 2008).

If the plaintiff succeeds in proving this prima facie case
by the preponderance of the evidence, "the burden shifts to the

---

[1] *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C.
Cir. 1999) ("In interpreting [the DCHRA] the District of
Columbia also follows [the Title VII] formula . . . ." (citing
*Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.
1993)); *see also Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp.
2d 76, 86 (D.D.C. 2006) ("[D]iscrimination claims under *both* the
DCHRA and Section 1981 are evaluated using the same framework as
claims arising under Title VII . . . .")(citing *Mungin v. Katten
Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997))(emphasis
added).

defendant to articulate some legitimate, nondiscriminatory reason for the [adverse action]." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (internal citations and quotations omitted). The employer's burden is therefore satisfied if it "simply 'explains what [it] has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Id.* at 256 (quoting *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n. 2 (1978)).

Once the defendant employer presents a "legitimate, non-discriminatory" reason for the adverse action, the prima facie case "drops out of the picture," and the burden shifts again. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008)(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)). The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The plaintiff may prove pretext, for example, by showing "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures . . . , the employer's pattern of poor treatment of other employees in the same protected group . . ., or other relevant evidence that a jury could reasonably conclude evinces

an illicit motive." *Toomer v. Mathis*, Civ. No. 11-2216, 2017 WL 3084376 at *7 (D.D.C. July 19, 2017) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015)). The employee's prima facie case is "part of the evidence" the Court "must consider in addressing [the] question of whether she has created a genuine issue of gender discrimination." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007)(internal citations and quotations omitted).

### 1. A Reasonable Jury Could Find That Ms. Carter-Frost Was Subject to Adverse Action

It is undisputed that Ms. Carter-Frost is a woman and therefore a member of a protected class under the statutes. Def.'s Reply, ECF No. 28 at 5, ¶ 1. At issue, then, is whether Ms. Carter-Frost suffered an "adverse action." *See* Def.'s Mot., ECF No. 19 at 7-12. Ms. Carter-Frost argues that she was subject to adverse action when she was "unjustly investigated . . . and audited" and "involuntarily detailed to [the] Forensics Unit and Fifth District." Compl., ECF No. 1 ¶¶ 38-54. The District argues that neither are adverse actions as a matter of law. Def.'s Mot., ECF No. 19 at 7-12.

An "adverse employment action" is "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v.*

*Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009)(internal citations and quotations omitted). The employee must have "experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002). Therefore, "[m]ere idiosyncrasies of personal preference are not sufficient" nor are "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation . . . ." *Id.* at 1130-31 (internal citations and quotations omitted). The Court addresses each alleged adverse action in turn.

### a. Administrative Investigation

Ms. Carter-Frost contends that the MPD investigation into her T&A work was adverse. Generally, "the 'mere initiation' of an investigation may not constitute a materially adverse action." *King v. Holder*, 77 F. Supp. 3d 146, 151 (D.D.C. 2015) (citing *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004)). However, an investigation may be adverse if it "resulted in 'materially adverse consequences affecting the terms, conditions, or privileges of [Plaintiff's] employment or [Plaintiff's] future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.'" *Id.* at 151-52 (quoting

*Youssef v. FBI*, 687 F.3d 397, 401 (D.C. Cir. 2012)). In *King v. Holder*, an investigation was adverse in part because the plaintiff's promotion was suspended pending the results of the investigation, potentially affecting the plaintiff's career. *Id.* So here too. The penalties for the T&A policy violation underlying the MPD's investigation ranged from "reprimand to removal." Notice of Proposed Action, ECF No. 24-9 at 2. Just as the stalled promotion affected the *King* plaintiff's career, possible termination affects Ms. Carter-Frost's career. *See* 77 F. Supp. 3d at 151-52. Additionally, the investigation exposed Ms. Carter-Frost to criminal liability had the U.S. Attorney's Office elected to prosecute, affecting far more than Ms. Carter-Frost's career. *See* USAO-DC Letter, ECF No. 24-10. Moreover, the investigation did in fact cause "material[ly] adverse consequences" to the terms of Ms. Carter-Frost's employment. She was detailed to the Forensics Unit and then to the Fifth District as "corrective action." Pl.'s Dep., ECF No. 24-2 at 53:8-19. On these facts, a reasonable jury could find the Bureau's investigation adverse because it had the potential to "affect her employment in a meaningful way." *Compare with Herbert v. Architect of the Capitol,* 766 F. Supp. 2d 59, 79 (D.D.C. 2011)(finding that an investigation did not meaningfully affect Plaintiff's employment because it "involved little more than interviews with various . . . employees; . . . never

proceeded beyond draft form; . . . [and there were] no recommendations specifically directed towards [Plaintiff]").

### b. Details to the Forensics Unit and Fifth District

Ms. Carter-Frost also argues that the two details, first to the Forensics Unit and then to the Fifth District, were adverse actions. *See* Pl.'s Opp'n, ECF No. 24 at 12-14. The District argues that these events were not adverse because the transfers were not accompanied by a decrease in pay, benefits, or responsibilities. Def.'s Mot., ECF No. 19 at 9-12.

Lateral transfers, as here, qualify as adverse employment actions only when the reassignment carries with it "significantly different responsibilities." *Czekalski v. Peters,* 475 F.3d 360, 364 (D.C. Cir. 2007)(quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2001)). Generally, this is a jury question, which the Court "may not take . . . away . . . if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities." *Id.* at 365. By contrast, mere "subjective dissatisfaction" with the transfer or the plaintiff's new working conditions does not qualify as adverse action." *Zelaya v. UNICCO Servs. Co.,* 733 F. Supp. 2d 121, 132 (D.D.C. 2010). Therefore, to determine whether the reassignment to patrol work was adverse, the Court must "compare the position the plaintiff held before the transfer to the one [s]he holds afterwards." *Pardo–Kronemann v. Donovan,* 601

F.3d 599, 607 (D.C. Cir. 2010). Viewing the evidence in the light most favorable to Ms. Carter-Frost, she has raised a genuine issue as to whether her second detail to the Fifth District left her with significantly different and diminished responsibilities.

The District suggests that Ms. Carter-Frost's duties during her first detail to the Forensic Department were "different" but not "significantly different" because the work was of the same type: "administrative." Def.'s Mot., ECF No. 19 at 11-12. True, but clearly it cannot make this argument for the second detail to the Fifth District. *Id.* at 12. As the District itself admits, T&A work is "administrative," while patrolling the streets of the Fifth District plainly is not. *Id.* Instead, the District argues that the second detail was not adverse because Ms. Carter-Frost's responsibilities were not diminished, but rather heightened because patrol work is critical to MPD's mission. *Id.* The Court is not persuaded that the second transfer was adverse as a matter of law.

Whereas Ms. Carter-Frost had training and decades of experience for her T&A role, she had not performed patrol work for over twenty years and felt dangerously ill-equipped to be "thrown directly onto the street." *Id.* at 60:20-61:1. In *Youssef*, the D.C. Circuit concluded that a jury could find that the Plaintiff's lateral transfer was adverse in part because his

new position "did not utilize his skills and expertise." 687
F.3d at 401. Similarly, Ms. Carter-Frost's skills and expertise
as a T&A clerk were not utilized on patrol in the Fifth
District. Her former position required training and a
"certificate." Pl.'s Dep., ECF No. 24-2 at 9:2-9; *see also*
*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S.
53, 71 (2006)(concluding that the jury had a reasonable basis to
find a reassignment adverse because the new position was "more
arduous" and the former position "required more
qualifications"). Whether or not the second detail was an
adverse action is therefore a factual dispute for a jury to
decide.

Additionally, a jury could find that Ms. Carter-Frost had
diminished responsibilities in the Fifth District based on the
District's own characterization of her former office—calling the
CID a "specialized unit." Answer, ECF No. 6 at 5, ¶ 32.
Additionally, the District itself described Officer J.Y.'s
admittedly "administrative" position as "prominent." Notice of
Proposed Action, ECF No. 24-9. Not only did Ms. Carter-Frost
work in the same office, it is undisputed that she also did
"administrative" work. Def.'s Mot., ECF No. 19 at 11. Therefore,
a reasonable jury could easily conclude that her former role was
"prominent" as well. *Compare with Wade v. District of Columbia*,
780 F. Supp. 2d 1, 18 (D.D.C. 2011) (finding a lateral transfer

to patrol work not an adverse action when the Plaintiff provided "no evidence" that the transfer affected the "privileges of his employment").

It may well be that patrol work is indeed more respected as mission-critical and therefore, Ms. Carter-Frost's responsibilities were not diminished. But on this record, the Court cannot agree with the District that its two employment actions—the investigation and the transfer to the Fifth District—were not adverse as a matter of law.

### 2. A Reasonable Jury Could Find That Gender Discrimination Motivated her Transfer to the Fifth District

Having established a prima facie case, the burden is now on the District to proffer a legitimate, non-discriminatory reason for investigating Ms. Carter-Frost and detailing her to the Fifth District to work patrol. The District does not provide any justification in the "gender discrimination" section of their motion, relying entirely on the argument that Ms. Carter-Frost has not established a prima facie case. *See* Def.'s Mot., ECF No. 19 at 8-12. However, the District does put forward a legitimate, non-discriminatory explanation in rebutting Ms. Carter-Frost's retaliation claim. *Id.* at 16-19. Because the retaliation case rests on the same alleged adverse action, the Court will assume *arguendo* that the District intended to put forth the same argument here. First, the District argues that it had a

legitimate reason to conduct the 2013 investigation because there was good reason to believe that Ms. Carter-Frost and Officer J.Y. violated its conflict of interest policy. *Id.* at 18. Second, it argues that it had a legitimate reason to detail Ms. Carter-Frost from the CID to the Forensics Unit and then to the Fifth District because it was inappropriate for her to continue as a T&A clerk in light her policy violation. *Id.*

The District did have a legitimate, non-discriminatory reason to conduct the investigation. It is undisputed that Officer J.Y. allowed Ms. Carter-Frost to use his login credentials to input her own time, violating MPD policy. *See* Investigative Report, ECF No. 24-6 at 3. While Ms. Carter-Frost claimed that she "was never told at training that she could not enter time under someone else's code," there is no basis in the record to believe that the investigation was unfounded or initiated for pretextual reasons. *Id*. Additionally, the District does assert a legitimate reason for detailing Ms. Carter-Frost away from T&A work to the Forensics Unit, in light of her violation. Def.'s Mot., ECF No. 19 at 18. However, the District relies on this same explanation to justify detailing Ms. Carter-Frost from the Forensics Unit—where she was not working as a T&A clerk—to the Fifth District on patrol. *See id*. This makes less sense because the second transfer was not from a T&A position. However, imposing disciplinary measures are legitimate when

warranted after a policy infraction. *See Baloch*, 550 F.3d at 1200. Ms. Carter-Frost testified that the involuntary detail to the Fifth District was punishment, or "corrective action," for her infraction. Pl.'s Dep., ECF No. 24-2 at 52:24-53:19.

Because the District put forward a legitimate justification for the adverse action, the burden flips to Ms. Carter-Frost to establish that the District's explanation is mere pretext, such that a reasonable jury could conclude that the District was motivated by gender. *See Burdine*, 450 U.S. at 253. She met her burden by providing evidence that the District treated similarly situated male officers, specifically Officer J.Y., more favorably than it did her. Pl.'s Opp'n, ECF No. 24 at 18-20.

A plaintiff can establish "pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race [or gender] . . . more favorably in the same factual circumstances.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Brady,* 520 F.3d at 495). At the summary judgment stage, a plaintiff must show, with "evidence substantiated by the record" that she and the comparator are "similarly situated." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were

disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301. Generally, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury," but the court may decide that employees are not similarly situated as a matter of law if a reasonable jury would be unable to conclude based on the facts that the two employees were similarly situated. *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005) (citations omitted.)

Ms. Carter-Frost presents evidence sufficient for a reasonable jury to conclude that she and Officer J.Y. were similarly situated. Specifically, the two performed administrative work in the same office: CID Headquarters. Pl.'s Dep., ECF No. 24-2 at 50:5-51:19; Recommendation Letter, ECF No. 24-7. Despite not having the same job title, the two did the same type of work. Indeed, the District characterizes Ms. Carter-Frost's "type" of work as "administrative," Def.'s Mot., ECF No. 19 at 11, and it describes Officer J.Y.'s "primary duties" as "administrative," Investigative Report, ECF No. 24-6 at 1. Despite not serving formally as a T&A clerk, Officer J.Y. was *certified* as a T&A clerk and entered T&A periodically. Pl.'s Dep., ECF No. 24-2 at 51:3-19. Like Ms. Carter-Frost, Officer J.Y. also had T&A login credentials and did "on a number of occasions" log onto the T&A database. Investigative Report, ECF

No. 24-6 at 3. As the District itself states, the only officers who typically had T&A credentials "were time and attendance clerks and supervisors". *Id.* at 6; *see also* Notice of Proposed Action, ECF No. 24-9 at 2. Viewing the evidence in the light most favorable to Ms. Carter-Frost, a jury could find that Officer J.Y.'s position was sufficiently similar to hers.

The District relies exclusively on Ms. Carter-Frost's and Officer J.Y.'s different job titles to justify its disparate treatment of the two: "[e]ven though J.Y. was also subject to the administrative investigation concerning time and attendance records, he was not a time and attendance clerk in CID. Therefore, he is not a proper comparator." Def.'s Mot., ECF No. 19 at 19. In support, the District cites to a single affidavit, which concludes, based on MPD records, that Officer J.Y.'s duties did not include inputting T&A and that he was not a T&A clerk. Tapp Aff., ECF No. 19-2 ¶¶ 8, 10. However, evidence in the record discussed *supra* indicates that Officer J.Y. did in fact input T&A. Furthermore, it is undisputed that Officer J.Y. and Ms. Carter-Frost underwent the same administrative investigation for the same charge and were both found to violate the same policy.[2] Pl.'s Opp'n, ECF No. 24 ¶ 3.

---

[2] Because Officer J.Y. and Ms. Carter-Frost both endured the administrative investigation and both potentially faced the same adverse consequences, a reasonable jury could not find that the District was motivated by Ms. Carter-Frost's gender in

However, the District's similar treatment of the two ends there. Whereas Ms. Carter-Frost was detailed two times in three months as "corrective action," Officer J.Y. was not transferred out of his "prominent" office and ultimately was not punished at all. *See* Notice of Proposed Action, ECF No. 24-9; Appeal, ECF No. 24-11. Therefore, a reasonable juror could infer, based on the District' unexplained disparate treatment, that it transferred Ms. Carter-Frost to the Fifth District due to her gender. Given this factual dispute, the District's motion for summary judgment on Ms. Carter-Frost's gender discrimination claim is **DENIED**. Ms. Carter-Frost's claim may proceed, but only to the extent that she argues that she endured gender discrimination when she was transferred to the Fifth District.

## C. A Reasonable Jury Could Not Find That Ms. Carter-Frost Was Subject to Retaliation

As with discrimination claims, a retaliation claim is subject to the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). "Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that [s]he engaged in statutorily

---

initiating it. Therefore, despite finding that the administrative investigation was an adverse action, Ms. Carter-Frost's gender discrimination claim may not proceed on this basis.

protected activity; (2) that [s]he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *Id*. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's asserted non-retaliatory reason was mere pretext for retaliation. *Id*. Thus, the "central question reduces to whether the plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason for its adverse action and that the employer intentionally retaliated against the plaintiff." *Walker*, 798 F.3d at 1092.

At issue is whether Ms. Carter-Frost established a prima facie case—specifically whether she engaged in protected activity and was subject to adverse action as a result. Ms. Carter-Frost argues that she engaged in protected activity on four occasions: (1) in 2002, when she filed an EEO claim with MPD's Internal Affairs office, Pl.'s Dep., ECF No. 24-2 at 27:12-29:22; (2) "beginning in early 2012," when she complained to her supervisors "regularly," Compl., ECF No. 1 ¶ 56; (3) on November 26, 2013, when she filed an EEO complaint with MPD's Internal Affairs regarding the Department's discriminatory

treatment, *id.* ¶ 57; and (4) in August 2013, when she filed a complaint with the EEOC, *id.* ¶¶ 58, 59. Ms. Carter-Frost also argues that she was subject to several adverse actions as a result of her protected activity. She alleges that she was: (1) "segregated from her coworkers"; (2) "audited"; (3) "placed under investigation"; (4) denied requests for leave, overtime, and a schedule change; (5) "involuntarily detailed" twice; and (6) denied requests for a detail back to her T&A position. *Id.* ¶¶ 56, 60. The District argues that Ms. Carter-Frost failed to establish a prima facie case as a matter of law because there is no record of her first three complaints. Def.'s Mot., ECF No. 19 at 12-16. Moreover, the District points out that her final EEOC complaint was filed *after* the alleged retaliatory behavior and thus her activity could not have caused any retaliatory action. *Id.* at 13-14.

Beyond Ms. Carter-Frost's self-serving deposition testimony, there is no evidence that she filed any complaint or regularly complained to her supervisors. *See generally* Pl.'s Opp'n, ECF No. 24 at 23-29. In contrast, the District submitted an affidavit from EEO Internal Affairs Branch Investigator Tapp, who stated that the EEO Office has no record of any complaint from Ms. Carter-Frost in 2002 and 2012. *See* Tapp Aff., ECF No. 19-2 ¶¶ 3, 4; *see Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create

genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."). Moreover, Ms. Carter-Frost's own deposition on this subject contradicts her argument. She undermined her claim that she "regularly complained" to her supervisors about discriminatory treatment when she could only recall one complaint to a supervisor. Specifically, she could only identify a single time that she complained during the spring of 2012 when she posted a "written post-it note" on her supervisor's door. Pl.'s Dep., ECF No. 24-2 at 35:15-36:6. Ms. Carter-Frost could not remember whether her supervisor responded to the complaint. *Id.* at 36:11-13. These vague, self-serving allegations are not sufficient evidence to create a dispute of material fact. *See Arrington v. United States,* 473 F.3d 329, 343 (D.C. Cir. 2006)("When a plaintiff relies entirely on his own self-serving testimony, which lacks any corroboration and is contradicted by all the available . . . evidence, a court is not obligated to reward the plaintiff with a jury trial."). While it is undisputed that Ms. Carter-Frost filed an amended EEOC claim in August 2013, *see* ECF No. 24-3, all of the alleged adverse actions occurred prior to February 2013. Therefore, Ms. Carter-Frost cannot establish that the District's actions were in retaliation for any protected activity.

Moreover, even if Ms. Carter-Frost had established a prima facie case, she fails to rebut the District's legitimate, nondiscriminatory reasons for the alleged adverse actions. As discussed above, the District investigated Ms. Carter-Frost, detailed her from T&A work, and denied her requests to return to T&A work—all because she had violated MPD T&A policy. *See* Def.'s Mot., ECF No. 19 at 18; *see, e.g.*, *Baloch*, 550 F.3d at 1200 (finding it legitimate that an employer took adverse action because the "disciplinary measures . . . occurred only after various infractions" and therefore "good institutional administration" justified discipline).

Ms. Carter-Frost raises the same comparator argument as she did for her gender discrimination claim—that the District's reasons are pretextual because she was treated differently than similarly situated male officers. Pl.'s Opp'n, ECF No. 24 at 25-29. However, unlike her discrimination claim, Ms. Carter-Frost fails to establish that Officer J.Y. and other male officers are proper comparators because she includes no information, beyond speculative conclusions, about the male officers' protected activity. *See id*. Without this information, the Court has no basis to find that the male officers and Ms. Carter-Frost are similarly situated. To succeed in a disparate treatment argument, "a plaintiff can cite the employer's better treatment of similarly situated employees *outside the plaintiff's*

*protected group . . . ." Toomer*, 2017 WL 3084376 at *7 (citing

*Walker*, 798 F.3d at 1092)(emphasis added). For the

discrimination analysis, the Court had that information

concerning Officer J.Y.'s gender. Here, the Court has no

information as to whether Officer J.Y. is "outside" Ms. Carter-

Frost's "protected group," that is, employees who engage in

protected activity. *See Felder v. Johanns*, 595 F. Supp. 2d 46,

68 (D.D.C. 2009)(examining whether the comparator employee

"engaged in protected activity" to determine whether that

employee was treated more favorably); *Anderson v. Donahoe*, 699

F.3d 989, 996 (7th Cir. 2012) ("Plaintiff has not identified

other employees who did not file EEO complaints (or engage in

similar protected activity) that received more favorable

treatment . . . . his claim fails."). Ms. Carter-Frost merely

speculates that Officer J.Y. has "no known EEO activity" without

citing support in the record. Compl., ECF No. 1 ¶ 32. While the

Court must examine the facts in the light most favorable to Ms.

Carter-Frost, it cannot "accept bare conclusory allegations as

fact." *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).

Therefore, unlike her discrimination claim, Ms. Carter-Frost

failed present evidence such that a reasonable jury could

believe that she suffered retaliation as a result of protected

activity, the District's motion for summary judgment on this

claim is **GRANTED**.

**D. A Reasonable Jury Could Not Conclude That Ms. Carter-Frost Was Subject to a Hostile Working Environment**

Ms. Carter-Frost alleges that, as a result of her protected status and protected activity, the District subjected her to a hostile working environment. *See* Compl., ECF No. 1 ¶¶ 73-84. According to Ms. Carter-Frost, she was "regularly and continually subjected to harassing conduct" including: (1) subjecting her to an investigation; (2) segregating her from her coworkers by detailing her to a "solitary assignment in a room with no phone or windows"; (3) denying her leave, overtime, and a schedule change; and (4) "involuntarily" detailing her to patrol work. *Id.* ¶ 75. Ms. Carter-Frost alleges that this harassment caused "routine[] humiliation." *Id.* ¶ 74. The District argues that Ms. Carter-Frost's claim fails as a matter of law because she has not presented any evidence of a hostile work environment. Def.'s Mot., ECF No. 19 at 19-21.

To prevail on a hostile work environment claim "a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Whether a workplace is actionably hostile involves both subjective and

objective analysis: "[t]he victim must subjectively perceive the environment to be abusive, and the complained about conduct must be so severe or pervasive that it objectively creates a hostile or abusive work environment." *Toomer*, 2017 WL 3084376 at *3 (citing *Harris*, 510 U.S. at 21–22). The court assesses a workplace environment by looking to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (internal citation and quotation omitted). In an effort to "filter out" complaints attacking the "ordinary tribulations of the workplace," the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Id.* (internal citation and quotation omitted).

Although Ms. Carter-Frost has alleged that she felt harassed and humiliated, none of Ms. Carter-Frost's allegations, taken alone or in combination, suggest an objectively hostile work environment. Ms. Carter-Frost alleges that she was "regularly and continually subjected to harassing conduct," but

the evidence that she relies on does not rise to the level of an objectively hostile treatment. For example, Ms. Carter-Frost was subject to an investigation for undisputed T&A violations. *See* Investigative Report, ECF No. 24-6 at 3. She was detailed away from her former colleagues as a result of that undisputed violation. Def.'s Mot., ECF No. 19 at 18; Pl.'s Dep., ECF No. 24-2 at 52:24-53:19. Furthermore, she has not established that she was regularly denied her requests for leave and schedule changes. *See generally* Pl.'s Opp'n, ECF No. 24. Therefore, this alleged "harassment" evidence does not show that the MPD was a workplace permeated with "discriminatory intimidation, ridicule and insult." *Harris*, 510 U.S. at 21 (quotation marks omitted). Just as in *Outlaw v. Johnson*, Ms. Carter-Frost "incorporated, without elaboration, the allegations of disparate treatment on which [she] relies for [her] [gender]-discrimination [and retaliation] claims," allegations that "cannot alone support a hostile-work-environment claim." 49 F. Supp. 3d 88, 91 (D.D.C. 2014). "Ultimately, 'mere reference to alleged disparate acts of discrimination ... cannot be transformed, without more, into a hostile work environment.'" *Id.* at 92 (quoting *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009)). Ms. Carter-Frost does not, as she must, describe the "day-to-day" insult or intimidation that a hostile work environment claim requires. *Id.* at 91. Indeed, she does nothing more than state that she felt

humiliated as a result of MPD's discriminatory treatment. *See*
Compl., ECF No. 1 at ¶¶ 73-84.

While Ms. Carter-Frost does complain of a single instance
of intimidation—she was "yelled at onsite and [had] her personal
space encroached upon by [her supervisor]," was "taunted" by the
supervisor, and had "to deal with implicit threats to her job"—
the record does not support that Ms. Carter-Frost's day-to-day
environment was objectively hostile. Pl.'s Opp'n, ECF No. 24 at
24; Pl.'s Dep., ECF No. 24-2 at 32:14-34:5. For example, Ms.
Carter-Frost could not remember what the supervisor said during
this lone encounter, testifying that she was intimidated because
of the supervisor's "tone." *Id.* No reasonable jury could find
this single encounter sufficient to support a hostile work
environment claim because it does not demonstrate a
"sufficiently pervasive pattern" of hostile conduct. *Toomer*,
2017 WL 3084376 at *6. Indeed, a "singular stray comment does
not a hostile environment make." *Freedman v. MCI Telecommc'ns
Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001). Moreover, as in
*Baloch*, Ms. Carter-Frost's assertions of pervasive abuse are
undermined by "the sporadic nature of the conflicts." *Baloch*,
550 F.3d at 1201. While Ms. Carter-Frost may have had "clashes"
with her supervisors, the totality of the circumstances does not
rise to the pervasive pattern necessary to support a hostile
work environment claim. *Id.* Therefore, the District's motion for

summary judgment as to the hostile work environment claim is

**GRANTED**.

## V.    Conclusion

For the foregoing reasons, the District's summary judgment

is **DENIED IN PART** and **GRANTED IN PART**. Ms. Carter-Frost's

remaining claim is her gender discrimination claim regarding the

"corrective action" lateral transfer to the Fifth District. A

separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**April 9, 2018**